UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| | )  CRIMINAL NO. 05-30026-MAP |
| v. | ) |
| | ) |
| | ) |
| | ) |
| CARLOS SALVATE, | ) |
|     Defendant | ) |

**<u>GOVERNMENT'S MEMORANDUM IN OPPOSITION TO THE DEFENDANT'S MOTION
TO SUPPRESS EVIDENCE</u>**

The government respectfully requests this Court to deny the Defendant's motion to suppress the firearm and ammunition taken from him by the Holyoke Police detectives during an investigatory stop on September 21, 2004 because reasonable suspicion justified both the stop at its inception and the scope of the ensuing search.  The evidence will establish that the detectives reasonable precautionary steps by stopping and detaining the Defendant and his four companions for a brief inquiry after the detectives received information from a known reliable informant that a group of gang members in the area possessed a firearm and were planning to shoot someone.  The detectives corroborated significant aspects of the informant's report before stopping the Defendant.  The reliability of the informant's report of the armed group was also bolstered by the occurrence of a drive-by shooting in Holyoke since the circumstances of the shooting -

including the identity of the victims, the suspects, and the location - were consistent with the informant's report. These factors created reasonable suspicion that criminal activity was afoot, warranting the detectives' brief stop and pat frisk of the Defendant and his companions. The police then lawfully recovered ammunition from the Defendant's pocket after placing the Defendant under arrest.

## Statement of Facts

The government anticipates that its witnesses will testify to the following:

On September 21, 2004, at approximately 9 p.m., a confidential informant alerted Holyoke Police Detective Brian Duke ("Duke") to a group of about five or six males who were in possession of a handgun. This informant, whose identity was known to Duke, stated that the group included members of Holyoke's Flat Bush Gang and that they were planning to shoot someone at a nearby location in Holyoke. The informant further detailed how one of the members of this group was known as "Tito," and how another member of the group was wearing a red short-sleeved shirt. This informant had previously provided information to Duke concerning gang-related crimes and drug offenses. Duke was able to corroborate past tips from the informant, and he deemed this informant to be credible and reliable.

Duke relayed the informant's report to Holyoke Police Detective Sean Shattuck ("Shattuck"), and Shattuck forwarded the information to his partners, Detective Daniel Reardon ("Reardon") and Detective Joseph Jones ("Jones"). All three veteran detectives immediately noted the significance of the name "Tito" in the informant's report. They were familiar with a prominent member of the Flat Bush Street Gang named Luis Ramos who was known as "Tito." The detectives knew that Ramos had been convicted of violent crimes and firearm offenses.

The informant's alert was particularly relevant to the detectives in light of the fact that two individuals were shot while standing near the intersection of Sergeant Street and Chestnut Street in Holyoke, an area frequented by the Holyoke Chapter of the Latin Kings, a short time before the informant contacted Duke. The detectives learned that a known member of the Latin Kings named Timothy Ganthier had been shot. Massachusetts State Police Captain Peter Higgins responded to the Holyoke Hospital Emergency room to interview witnesses to the shooting. During his investigation, Higgins learned, from sources independent to Duke's informant, that members of the Flat Bush Gang were planning to shoot a Latin King as retaliation for the recent shooting of a Flat Bush member. Higgins shared this information with Detective McGillicuddy of the Holyoke Police department, who in turn notified Detective Shattuck.

As Detectives Shattuck, Jones, and Reardon, responded to the Flat Bush section of Holyoke, Detective Duke's informant provided an updated report concerning the armed group. According to the informant, the Flat Bush group had just exited a car at North East Street in Holyoke. Shattuck, Reardon, and Jones quickly responded to that area, and almost immediately observed Ramos (a.k.a. Tito) amongst a group of five young men who were walking on the sidewalk on North East Street.

The Detectives noticed that one of the individuals accompanying Ramos was wearing a red short-sleeve shirt, also consistent with the informant's description of the group. The individuals with Ramos were later identified as the Defendant Salvate, Alex Nieves ("Nieves"), Rolando Lopez ("Lopez"), and Jose Burgos ("Burgos").

When the detectives approached the group to conduct a threshold inquiry, the members of the group separated. While Ramos and Burgos proceeded in one direction, the Defendant, Nieves, and Lopez walked in another direction. The detectives yelled out "hold on for a minute," and all the members of the group complied except the Defendant. While Detective Shattuck approached Ramos and Burgos, Detectives Jones and Reardon walked toward the Defendant, Nieves, and Lopez. Detective Jones then repeated his instruction to the Defendant to "hold up."

Although the Defendant stopped walking, he refused to face

the detectives. Instead he kept his back to the detectives and placed his right hand over his right pant's pocket area. Jones ordered the Defendant to raise his hands, and when the Defendant complied, Jones observed a bulge protruding from the Defendant's pant's pocket. For safety reasons, the detectives ordered the individuals to lay on the ground. When Jones attempted to pat frisk the Defendant, the Defendant placed all of his weight on the right side of his body, which faced the ground, and refused to move. It appeared to Jones that the Defendant's conduct was meant to conceal something. When Jones took hold of the Defendant and rolled him onto his left side, he observed the grip to a firearm protruding from the right side of the Defendant's waistband. The Defendant violently resisted Jones's attempt to recover the firearm, and even attempted to wrest control of the firearm from Jones. The Defendant fought with Jones until Detective Reardon subdued him by striking him in the head with a flashlight. Jones then recovered a Smith & Wesson revolver, loaded with six rounds of ammunition in the firearm's chamber, from the Defendant's waistband.

The detectives placed the Defendant under arrest for charges that included unlawful possession of a firearm and assault and battery. They then arranged for him to be examined at the Holyoke Hospital for injuries he received during the struggle for his firearm. While at the hospital, the Defendant told Holyoke

Police Officer William Delgado ("Delgado") that he had something in his pocket that he wanted to "get rid of." Delgado then retrieved six additional rounds of ammunition from the Defendant's pocket.

## Argument

**1. Under <u>Terry</u> and its progeny, investigatory stops based upon reasonable suspicion are constitutionally permissible**

In <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), the Supreme Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to effect an arrest." <u>Id.</u> at 22. An "inchoate and unparticularized suspicion or 'hunch'" of criminal activity is insufficient to justify such a stop. <u>Id.</u> at 27. Rather, the government must show "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." <u>United States v. Woodrum</u>, 202 F.3d 1, 6 (1st Cir. 2000); see <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002) (question is whether there is a "particularized and objective basis" for suspecting legal wrongdoing); see also <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989) (level of suspicion required for <u>Terry</u> stop "obviously less demanding than that for probable cause"). The reasonable suspicion inquiry is conducted in light of the totality of the

6

circumstances, and warrants a "practical, commonsense approach." United States v. Sowers, 136 F.3d 24, 27 (1st Cir. 1998); see Illinois v. Wardlow, 528 U.S. 119, 125 (2000) (reasonable suspicion determination "must be based on commonsense judgments and inferences about human behavior") (citation omitted).  In reviewing the appropriateness of an investigative stop, courts give deference to the ability of experienced officers to make inferences and deductions from the cumulative information presented to them.  Arvizu, 534 U.S. at 273;  Woodrum, 202 F.3d at 7; United States v. Trullo, 809 F.2d 108, 112 (1st Cir. 1987) ("The circumstances under which the officers acted 'are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.'") (quoting United States v. Hall, 525 F.2d 857, 859 (D.C. Cir. 1976)).

    Moreover, the information giving rise to an investigatory Terry stop need not be consistent only with the commission of a crime on the part of the person detained.  As the Supreme Court stated in Wardlow in response to an argument that flight from the police is not necessarily indicative of ongoing criminal activity:

> This fact is undoubtedly true, but does not establish a violation of the Fourth Amendment.  Even in Terry, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation.  The officer observed two individuals pacing back

>and forth in front of a store, peering into
>the window and periodically conferring.
>[Citation omitted].  All of this conduct was
>by itself lawful, but it also suggested that
>the individuals were casing the store for a
>planned robbery.  <u>Terry</u> recognized that the
>officers could detain the individuals to
>resolve the ambiguity. [Citation omitted].
>
>In allowing such detentions <u>Terry</u> accepts the
>risk that officers may stop innocent people.
>Indeed, the Fourth Amendment accepts that
>risk in connection with more drastic police
>action; persons arrested and detained on
>probable cause to believe they have committed
>a crime may turn out to be innocent.  The
><u>Terry</u> stop is a far more minimal intrusion,
>simply allowing the officer to briefly
>investigate further.  If the officer does not
>learn facts rising to the level of probable
>cause, the individual must be allowed to go
>on his way.  But in this case the officers
>found respondent in possession of a handgun,
>and arrested him for violation of an Illinois
>firearms statute.

528 U.S. at 125-26.  <u>See</u> <u>also</u>, <u>e.g.</u>, <u>Arvizu</u>, 534 U.S. at 277 ("A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct" (citing <u>Wardlow</u>)).

In determining whether there was reasonable suspicion to support an investigatory stop, the Court must first determine whether the officers' actions were justified at their inception, and second, whether the actions taken were "reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officers during the stop."  <u>United States v. Maguire</u>, 359 F.3d 71, 76 (1st Cir. 2004), (<u>quoting</u> <u>United States v. Trueber</u>, 238 F.3d 79, 92 (1st

Cir. 2001)). Both questions require a balancing of the "need to search [or seize] against the invasion which the search [or seizure] entails." Terry, 392 U.S. at 21 (quoting Camara v. Municipal Court of San Francisco, 387 U.S. 523, 534-537 (1967)).

### A. The investigating detectives had reasonable suspicion to stop the Defendant.

The detectives' decision to conduct an investigatory stop of the Defendant was justified at its inception by reasonable and articulable factors known to the detectives that criminal activity that posed an immediate danger to the public might be underway. The Supreme Court has recognized that "[T]he Fourth Amendment does not require a policeman, who lacks the precise level of information necessary for probable cause to arrest, to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual in order to determine his identity or to maintain the status quo momentarily while obtaining more information may be most reasonable in light of the facts known to the officer at the Time." Adams v. Williams, 407 U.S. 143, 145 (1972).

Here, the detectives acted reasonably responsive to the circumstances known to them by stopping the Defendant and his

9

group.  First, a known individual, Detective Duke's informant, provided information that a specific group of individuals, members of the Flat Bush gang including "Tito," were planning to shoot an unknown individual.  The informant then gave a precise location for the group.  The specific and urgent nature to the informant's report required immediate action by the police especially since the informant was not only known, but also deemed to be credible by Detective Duke.  The informant's detailed description of the group planning the shooting was later corroborated by the investigating detectives when they observed the Defendant in the presence of "Ramos, a.k.a. Tito and another individual in a red shirt.

    Second, the occurrence of a fatal drive-by shooting at a location frequented by the Latin Kings (rivals to the Flat Bush gang) caused the detectives justifiable concern and heightened awareness of the Flat Bush Gang.  The detectives knew from their experience that rapid retaliatory shootings were common amongst gangs.  They also knew that the Flat Bush gang maintained an ongoing hostile relationship with the Latin Kings.  Soon after the shooting, the detectives received an independent report from Captain Higgins, who was investigating the shooting, that the Flat Bush Gang and the Latin Kings were preparing for war.

    After receiving news of the shooting and the informant's report to Detective Duke, Detectives Shattuck, Jones, and Reardon

then observed Ramos, a known Flat Bush gang member with history for violence and firearms, with a group present in a high crime area less than two miles from the scene of the recent shooting of a rival gang member shooting. These circumstances alone justified the detectives' investigatory stop of the Defendant and his group. All of the above factors occurred in a reasonably short time period preceding the detectives' decision to stop the Defendant.

The Supreme Court's decision in Adams v. Williams addressed circumstances that were very similar to this case.[1] 407 U.S. 143 (1972). In Adams, the Court noted that when an informant is known personally to the officers involved, that is itself a significant indicator of reliability which strengthens the reasonable suspicion to support an investigatory stop. Id. at 146. The Court further emphasized the reasonableness of relying upon information from an informant who has provided information in the past, and whose tip includes information that is "immediately verifiable at the scene." Id. See also Alabama v. White, 496 U.S. 325, 326-327 (1990) (reasonable suspicion to stop person after anonymous informant correctly described detainee's

---

[1] In Adams, the arresting officer was on duty when a known informant who had provided reliable information in the past contacted him with information about suspect possessing a firearm and drugs. Without further corroboration, the officer approached a suspect who matched the informant's description and location. Adams, 407 U.S. at 145. Upon approaching the suspect, the officer reached to the suspect's waist area and recovered a weapon. Id.

11

vehicle, time of departure, and destination).

The First Circuit has also had occasion to apply these principles to cases with similar facts. In United States v. Taylor, 162 F.3d 12, 18-20 (1st Cir. 1998), the Court held that an informant's tip, once corroborated in part by the police, that the occupants of an automobile were in possession of drugs and weapons was sufficient to warrant the investigative stop of an automobile followed by a limited search of the occupants. Similarly, in United States v. Lewis, 40 F.3d 1325, 1330-31, 1336 (1st Cir. 1994), the Court upheld a finding of reasonable suspicion based upon a phone call from a known confidential informant concerning individuals in possession of firearms, together with police surveillance corroborating the physical description and movement of the suspects. See also United States v. Gilliard, 847 F.2d 21, 25 (1st Cir. 1988) (reasonable suspicion properly based not only on general character of neighborhood but also on specific lead from confidential informant of proven reliability).

Accordingly, this Court should conclude that the circumstances known to the detectives, and viewed through the detectives experience, amounted to reasonable suspicion to stop and briefly detain the Defendant and his companions. The detectives were not only justified but in fact obligated to approach the group for an investigatory stop based on the

12

cumulative information known to the police. The factors supporting the stop of the Defendant also warranted a pat-frisk for weapons.

> **B.  The detectives, reasonably suspecting that they were approaching an armed group, were justified in conducting a limited search for weapons to protect themselves and the public**.

Under the second step of Terry, once a police officer is justifiably confronting an individual for any reason, the officer may take reasonable steps to ensure that the individual is not in a position to harm the officer or others in the area. Terry, 392 U.S. at 27; Taylor, 162 F.3d at 20 (police permitted to conduct reasonable search for weapons during Terry stop) citing Terry, Id. See also United States v. Villanueva, 15 F.3d 197 (1st Cir. 1994). Although "articulable facts" suspicion is the measure of reasonableness under both prongs of Terry, it is not necessary that the specific facts observed prove that the officer or others are in danger. As the Supreme Court noted in Terry, "[t]he officer need not be absolutely certain that the individual is armed: the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or the safety of others was in danger." Terry, 392 U.S. at 24-27; see also Trullo, 809 F.2d at 113.

In the present case, the detectives reasonably feared for their safety, upon encountering the Defendant and his group, and

they properly took immediate steps to ensure that none of the individuals could harm them or others during the stop. In addition to the factors, as outlined above, supporting the inception of the stop, the following factors clearly justified the detectives' safety concerns and the need for a limited search of the Defendant:

1. the detectives were outnumbered by the group, late in the evening, in a high crime area;

2. the Defendant's group appeared to split into two groups once they observed the police approaching;

3. the Defendant acted evasively, keeping his back to the detectives and covering his pocket with his hand; and,

4. the officers noticed a bulge in the Defendant's pocket area.

Based upon the cumulative information viewed through their experiences as veteran detectives, the detectives took reasonable steps to protect themselves by ordering the suspects to the ground and performing pat-frisks on each suspect. See, e.g. United States v. Romain, 393 F.3d 63, 72-73 (1st Cir. 2004)(officers reasonable belief that individual was armed justified pat-frisk) citing Taylor, 162 F.3d at 17 (in the context of a valid Terry stop, a reasonable safety concern justifies disarming the suspect). Detective Jones limited his search by frisking the individuals' outer clothing in the attempt to locate weapons, not just any contraband. This limited search was reasonable under the circumstances and, thus,

constitutionally appropriate.  See Adams, 407 U.S. at 148 citing Terry, 392 U.S. at 30; Romain, 393 F.3d at 72-73; Taylor, 162 F.3d at 20; compare United States v. Lott, 870 F.2d 778, 785 (1st Cir. 1989)(Terry search not valid where, inter alia, police not in fear for their safety).  The police are not required to gamble with their safety and they may draw on their experience and training to make inferences from and deductions about the cumulative information they receive in determining whether there is reasonable suspicion to warrant a Terry-type frisk.  See Arvizu, 534 U.S. at 273.

   Here, the detectives were also justified in ordering all of the individuals onto the ground as a means of neutralizing the potential danger to themselves and others.  See Jackson, 918 F.2d 236, 238-239 (1st Cir. 1990) (police action in blocking defendant's vehicle and frisking vehicle's occupant did not convert the investigatory stop into an arrest).  Furthermore, the detectives' decision to display their firearms did not turn the encounter with the Defendant into an arrest.  Trullo, 809 F.2d at 113 (officer's drawing of his gun was reasonably related in scope to circumstances which justified stopping defendant).  This Court has consistently held that police officers may draw their weapons without transforming an otherwise Terry stop into an arrest.  See Maquire, 918 F.2d at 259 ("It seems settled that the use of guns and the presence of more than one police officer does not

15

necessarily convert a Terry stop into a de facto arrest."). The Court's decision in Trullo is particularly instructive because the justification for the police officers' drawing of weapons was significantly less compelling than in this case. In Trullo, the police officers' suspicions were based upon the high crime location and upon the fact that an officer had witnessed a brief encounter between the suspect and a person in a car. Trullo, 809 F.2d at 111-113. The suspicion that the suspect was armed was based on the inference that the suspect had been involved in a drug deal and that persons involved in drug deals often carry weapons. Id. In this case, the police were following a tip from a reliable source explicitly telling them that someone in the Defendant's group was carrying a firearm for the purpose of shooting someone.

The Defendant, relying on the Supreme Court's decision in Florida v. J.L., 529 U.S. 266 (2000), argues that the reporter in this case essentially amounted to that of an anonymous tipster whose information could not supply reasonable suspicion for the police to stop the defendant and his companions. The Defendant's argument fails because the police in this case had far more information about the reporter than existed in Florida v. J.L., Id. In Florida v. J.L., the Supreme Court held that a completely anonymous tip that an individual of a certain description in a certain location possessed a gun cannot, absent sufficient

16

indicia of reliability, provide the basis for an investigatory stop. Id. In so doing, the Court distinguished the tip at issue there, which emanated from an unknown location and an unknown caller, with "a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated." Id. The informant in the instant case was not only known, but had also previously provided reliable information to Detective Duke. In Florida v. J.L., the Supreme Court noted that "[a]ll the police had to go on was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." Id.

The First Circuit has recognized that the Supreme Court in Florida v. J.L. was concerned with tips from persons who could not be held accountable if their information proved inaccurate or false. See United States v. Barnard, 299 F.3d 90, 93 (1st Cir. 2002)(distinguishing the known confidential informant in that case from an anonymous tipster on the grounds that he "was known to the police and could be held responsible if his assertions proved inaccurate or false.").

Finally, the police lawfully recovered six rounds of ammunition from the Defendant's pocket at the Holyoke Hospital as incident to his arrest for, inter alia, unlawful possession of the firearm and assault and battery on a police officer. United

17

States v. Meade, 110 F.3d 190, 199 (1st Cir. 1997) citing United States v. Uricoechea-Casallas, 946 F.2d 162, 165 (1st Cir. 1991).

## **CONCLUSION**

For the foregoing reasons, this Court should deny the Defendant's Motion to Suppress.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  /s/ Paul Hart Smyth
     _____
     Paul Hart Smyth
     Assistant U.S. Attorney